**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| DANGEROUS MEDIA, LLC; and<br>ANGEL VALLEY PRODUCTIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>WARNER BROS. DISCOVERY, INC.;<br>DISCOVERY LICENSING, INC.; and<br>DOES 1 through 10, inclusive,<br><br>Defendants. | CIVIL ACTION FILE<br><br>No. ______________________<br><br>PUBLIC REDACTED VERSION |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Dangerous Media, LLC ("Dangerous Media") and Angel Valley Productions, LLC ("Angel Valley") (collectively, "Plaintiffs" or "Producers"), by and through their counsel of record, in their complaint against Warner Bros. Discovery, Inc. ("WBD") and Discovery Licensing, Inc. ("DLI") (collectively, "Defendants"), hereby allege as follows:

## NATURE OF THE CASE

1. This case arises from Warner Bros.' years-long violations of media licensing agreements related to Producers' *Auto/Biography* Franchise. These violations include (a) Warner Bros.' unauthorized distribution and other use of the *Auto/Biography* Franchise on television and in other mediums for years beyond the applicable license terms, (b) Warner Bros.' unauthorized sale and/or licensing of the *Auto/Biography* Franchise directly to consumers, and (c) Warner Bros.' failure to otherwise perform under its agreements, depriving Producers of significant revenue from the *Auto/Biography* Franchise and causing grievous harm to Producers' business.

2. Although various Warner Bros. representatives have generally admitted to its misuse of the *Auto/Biography* Franchise, Warner Bros. nevertheless continued to engage in misuse of the *Auto/Biography* Franchise for years thereafter, willfully and intentionally withholding from Producers the licensing fees and penalties owed under the parties' contracts. Warner Bros. has engaged in what can only be described as a resource starvation strategy, leveraging years of withheld payments to pressure a significantly smaller production company to accept pennies on the dollar rather than fight a corporate behemoth. Producers bring this lawsuit, backed by written admissions of Warner Bros.' own employees and other incontrovertible evidence such as the programs airing on television when they were not supposed to be, to force Warner Bros. to honor its contracts and pay those who produce programming it distributes. Indeed, on information and belief, even as this dispute moves to the courts, Warner Bros. continues to air and/or stream the *Auto/Biography* Franchise in some capacity without any right to do so or any corresponding payments to Producers.

3. Warner Bros.' contractual violations and misconduct can be generally grouped into the following types:

a. Warner Bros. has used the *Auto/Biography* Franchise on its television networks and/or streaming platforms for years after the applicable licenses expired and generally does not dispute doing so.

b. Warner Bros. sold (or allowed to be sold on its behalf) licenses for the Auto/Biography Franchise directly to consumers, [redacted]. Warner Bros. does not dispute that these direct-to-consumer sales occurred or that it has retained the proceeds from them.

c. Warner Bros. neglected a critical agreement between the parties governing authorized sales of additional *Auto/Biography* programs Producers delivered in 2019, and as a result, did not make a reasonable effort to sell licenses to those programs to other distributors and exhibitors, while affirmatively misleading Producers with respect to its performance under that agreement.

4. Beyond the licensing fees and payments described above, Warner Bros. has not paid Producers for licenses of the *Auto/Biography* Franchise issued in Canada and Italy, and has repeatedly provided counterfactual information to Producers regarding its use and misuse of the Franchise, in an effort to induce Producers to accept less money than they are owed under the parties' contracts.

5. Warner Bros.' misconduct extends beyond its breach of contract and violation of Producers' own copyrights. Because Producers' programs incorporate third-party audio, video, images, and other copyrighted content, Warner Bros.' unauthorized use also exposes both parties to the copyright claims of myriad third parties, creating a cascading liability scenario. Compounding this harm, Warner Bros.' actions and inactions caused Producers to prematurely end production of the *Auto/Biography* Franchise altogether, greatly limiting Producers' earnings and future earning potential.

6. Warner Bros. maintains that their years-long misuse of the programs is inadvertent, and each time it happens, it again is inadvertent, over and over, for years, necessarily requiring one to believe that Warner Bros. systems and processes are in such a state that they cannot stop using Producers' programs despite years of its best efforts. Whatever the cause, Warner Bros.' misuse of

the *Auto/Biography* Franchise is uncontested, and its continued withholding of payment for years has been, and continues to be, an intentional and willful choice made in bad faith.

7. Warner Bros.' exposure is not limited to Producers. If Warner Bros.' years-long misuse of the Franchise resulted from errors in its distribution, licensing, and reporting systems, as Warner Bros. has at times suggested, the likelihood that those errors happened to affect only the thirty-four programs owned by Producers — out of the thousands of programs in Warner Bros.' global catalog — is exceedingly improbable. Indeed, Producers served an Audit Notice on Warner Bros. seeking an independent, third-party audit of Warner Bros.' license compliance and distribution operations, and Warner Bros. refused to permit that audit. Warner Bros.' refusal reflects its unwillingness to determine, or to allow Producers to determine, the true scope of its misuse — a scope that, if it extends to even a fraction of Warner Bros.' catalog, would expose Warner Bros. to substantial liability to numerous other producers and rightsholders whose programs may have been subject to the same undisclosed overuse.

8. Accordingly, through this lawsuit, Producers intend to stop Warner Bros.' misuse of Producers' programs, and to recover the compensation to which they are entitled for the financial, vocational, reputational, and other damages suffered as a result of Warner Bros.' breach of contract and other intentional misconduct.

## PARTIES

9. Plaintiff Dangerous Media, LLC is a California limited liability company with its principal place of business located at 59 E. Orange Grove Ave., Burbank, California 91502.

10. Plaintiff Angel Valley Productions, LLC is a California limited liability company with its principal place of business located at 59 E. Orange Grove Ave., Burbank, California 91502.

11. Defendant Warner Bros. Discovery, Inc. ("WBD") is a Delaware corporation with its principal executive offices at 230 Park Avenue South, New York, New York 10003. WBD was formerly known as Discovery, Inc. prior to an April 8, 2022 transaction in which Discovery, Inc. acquired the WarnerMedia business and changed its name to Warner Bros. Discovery, Inc. WBD is the ultimate corporate parent of Defendant Discovery Licensing Inc. Following the 2022 transaction,

WBD implemented an integrated management structure through which WBD-level executives exercised responsibility over functions including network distribution, content licensing, legal affairs, streaming-platform agreements, and related corporate operations.

12. Before the 2022 transaction, these same functions were likewise managed at the Discovery corporate level. Discovery identified its Chief Development, Distribution & Legal Officer as responsible for, among other things, Discovery's corporate legal team, business-affairs function, and distribution operations. Following the transaction, that executive became WBD's Chief Revenue and Strategy Officer, with WBD-level responsibility over Network Distribution, Content Licensing & Home Entertainment, Legal, and Streaming Platform Agreements.

13. Discovery Media Ventures Limited ("DMVL") is a private limited company organized under the laws of the United Kingdom and was the original contracting party to the 2017 Distribution Agreement. DMVL is not a defendant in this action, and Plaintiffs do not assert a claim for breach of the 2017 Distribution Agreement here. DMVL and that agreement are identified only as necessary to explain the parties' course of dealing, the scope and expiration of rights in the 2017 Programs, and the later conduct giving rise to the claims asserted in this action.

14. Defendant Discovery Licensing, Inc. ("DLI") is a Delaware corporation and, on information and belief, maintains its principal place of business in New York, New York. DLI therefore is a citizen of Delaware and New York for purposes of 28 U.S.C. § 1332. DLI is the contracting party to the 2019 Distribution Agreement with Dangerous Media and, absent a valid assignment or assumption, remains directly responsible for its obligations under that agreement. No assignment of the 2019 Distribution Agreement to another entity has been disclosed to Plaintiffs. On information and belief, following the 2022 transaction, DLI's operational administration became integrated into WBD's organization: WBD personnel purported to perform and speak for the business responsible for DLI's distribution, licensing, accounting, and reporting obligations, while the separate operational role of DLI, if any, was not disclosed to Plaintiffs.

15. Motor Trend Group, LLC ("MTG") was the original contracting party with Angel Valley under the Master Acquisition Agreement and the three related Attachment Agreements. At

the time those agreements were executed, MTG operated within the Discovery corporate family and conducted, among other things, the MotorTrend television and automotive-media businesses. The MotorTrend Agreements expressly permit MTG to assign its rights and obligations. MTG is identified here because it is the historical contracting party; the subsequent allocation of its rights and obligations is addressed below.

16. Beginning in or around 2022 and continuing thereafter, WBD substantially reorganized the Discovery and MotorTrend businesses, consolidating personnel and operations and, on information and belief, dismantling MotorTrend's in-house production operations and shutting down the standalone MotorTrend+ streaming service in 2024. During and after these reorganizations, WBD continued to operate the MotorTrend linear television network and continued to exercise and administer programming rights through that network.

17. In December 2024, WBD sold portions of the MotorTrend business to Hearst, including its publishing, digital-media, and related automotive-media businesses. On information and belief, WBD did not transfer the MotorTrend linear television network through that transaction, but instead retained and continued to operate that network. WBD's continued ownership and operation of the network is further demonstrated by its January 2026 rebranding of the MotorTrend television network as "Discovery Turbo," after which WBD continued operating the same automotive-focused linear television service.

18. Irrespective of the formal allocation of MTG's contractual obligations, WBD itself directly participated in the conduct alleged below and exercised or benefited from rights originally granted under the MotorTrend Agreements. Among other things, WBD continued to operate television and streaming platforms through which Plaintiffs' Programs were exploited; controlled personnel and systems responsible for scheduling and removing the Programs; investigated Plaintiffs' complaints concerning expired licenses and unauthorized exhibition; represented that Programs were being removed from third-party platforms; offered compensation for known overuse; controlled Plaintiffs' access to business personnel and information concerning the Agreements; and responded

to Plaintiffs' efforts to obtain accounting and audit information. These allegations are based on WBD's own conduct, not merely on its status as a corporate parent.

19. Plaintiffs therefore allege DLI's liability as the contracting party to the 2019 Distribution Agreement. Plaintiffs separately allege WBD's liability for its own direct participation in the tortious and infringing conduct alleged herein and, to the extent established through discovery, as an assignee, assuming party, or successor with respect to contractual rights or obligations originally held by DLI or MTG. With respect to the MotorTrend Agreements specifically, on information and belief, as part of WBD's internal reorganizations, the shutdown and integration of MotorTrend's television operations, and/or the December 2024 transaction with Hearst, some or all rights and obligations relating to the television exhibition of the Programs were retained by, transferred to, assigned to, assumed by, and/or administered by WBD or one or more WBD-controlled entities. The precise allocation of those rights and obligations is uniquely within Defendants' and their affiliates' possession and control. Does 1 through 10 include any presently unidentified entity that retained, received, assumed, or was assigned those obligations. Plaintiffs plead these theories in the alternative.

20. WBD, DLI, and Does 1 through 10 are collectively referred to as "Defendants." For narrative convenience, references to "Warner Bros." describe WBD, DLI, and, where the context concerns historical or operational conduct, the Discovery/Warner personnel and affiliated entities that administered or exploited the Programs, including nonparty DMVL and MTG. The term does not allege that those entities are legally identical, that every Defendant committed every act alleged, or that liability arises merely from corporate affiliation. Where the identity of the responsible legal entity is known and material to a claim, Plaintiffs identify it specifically.

## JURISDICTION AND VENUE

21. This Court has original subject matter jurisdiction over Plaintiffs' Third Cause of Action (Copyright Infringement) pursuant to 28 U.S.C. §§ 1331 and 1338(a), and supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims arise from the same case or controversy.

22. In the alternative, this Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs Dangerous Media, LLC and Angel Valley Productions, LLC are California limited liability companies. For purposes of diversity jurisdiction, an LLC's citizenship is determined by the citizenship of each of its members. No member of either Dangerous Media, LLC or Angel Valley Productions, LLC is a citizen of Delaware or New York. WBD is, on information and belief, a citizen of Delaware and New York. DLI is a Delaware corporation and, on information and belief, a citizen of Delaware and New York. On the basis of the foregoing, complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23. Venue is proper in this District as to claims arising from the MotorTrend Agreements pursuant to the exclusive Maryland forum-selection provision contained in those agreements, to the extent WBD or another Defendant assumed or succeeded to MTG's rights and obligations thereunder. Venue is also proper as to the claim arising under the 2019 Distribution Agreement pursuant to 28 U.S.C. § 1391(b)(2) because, on information and belief, a substantial part of the events giving rise to that claim occurred in this District, including DLI's negotiation, execution, and/or administration of that Agreement through its then-existing Silver Spring, Maryland operations. Venue is independently proper as to Plaintiffs' copyright claim pursuant to 28 U.S.C. § 1400(a) because WBD may be found in this District. WBD maintains substantial operations in this District, including a Global Linear Networks and Corporate facility in Silver Spring, Maryland. On information and belief, during the period of unauthorized use alleged herein, WBD distributed, exhibited, transmitted, and/or made the copyrighted Program available through its television and streaming services to viewers and subscribers in Maryland. WBD's Maryland-directed exploitation of the Program forms part of the infringing conduct alleged herein and subjects WBD to personal jurisdiction in this District with respect to Plaintiffs' copyright claim.

24. Specifically, in Section 12.4 of the Master Acquisition Agreement (defined below and attached as Exhibit B), the parties thereto agreed as follows:

[redacted]

25. The 2019 Distribution Agreement is governed by Maryland law.

## FACTUAL ALLEGATIONS

### A. The *Auto/Biography* Franchise

26. *Auto/Biography* is an automotive-centric non-fiction television program franchise developed and owned by Producers. Two "series" of programs exist under this franchise: *Auto/Biography* and *Auto/Biography: Cold Cases* (collectively, the "*Auto/Biography* Franchise").

27. The main series, *Auto/Biography*, is generally described as a one-hour, non-fiction program that tells entertaining stories about cars and car culture, frequently in a historical context. There exist two seasons of this series comprised of twenty-one programs.

28. The spin-off series, *Auto/Biography: Cold Cases*, is generally described as a one-hour, non-fiction "true crime" program with an automotive focus. There exists one season of this series comprised of thirteen programs.

29. The Programs are produced through a collaboration between two separate but related production companies — Angel Valley Productions LLC, founded in 2003, and Dangerous Media LLC, founded in 2014. The *Auto/Biography* Franchise itself progressed from a seven-episode order in 2017 to a twenty-six-episode order across two additional series in 2019, with corresponding license

fee growth from [redacted] to [redacted] per program – a pattern of escalating market demand consistent with the franchise's continued commercial viability absent Warner Bros.' misconduct.

**B. The 2017 Distribution Agreement**

30. In or around 2017, during its normal course of business, Producers discussed new opportunities with Warner Bros.' catalog business unit.[1] Warner Bros., being a global media conglomerate, is both a distributor (or seller) of media and also an exhibitor of media, *i.e.* showing media to viewers through their various channels and streaming platforms. The catalog business unit is part of the distribution business, in which a database – colloquially a catalog – of programs is managed, and from that catalog, a team of salespeople market and sell certain licenses to those programs to networks, other distributors, and exhibitors around the world – including inside sales to networks within Warner Bros.' own organization. The way this catalog is populated with programs is either through Warner Bros. producing or commissioning the programs themselves, thereby owning the programs, or otherwise acquiring rights to programs from a third party, as is the case here.

31. The parties agreed that Warner Bros. would acquire [redacted], and would do so for an initial term of [redacted] following the delivery of the programs, after which [redacted].

32. Under a distribution agreement of this kind, Warner Bros. did not itself acquire the perpetual rights to, or otherwise ownership of, the *Auto/Biography* Programs, nor did such an agreement itself mean Warner Bros could air or stream the programs on its channels on the exhibition side of its business. Rather, this was a sales and marketing agreement. Warner Bros. would become the exclusive sales agent for the programs: it was granted [redacted]. In essence, Producers were licensing the *Auto/Biography* Programs to Warner Bros., and

[1] The term "catalog business unit" is a term of art for the business unit within Warner Bros. responsible for sales and marketing of programs from a database of some sort, colloquially a "catalog."

Warner Bros. was selling new licenses (technically "sublicenses") all over the world. This exclusive right extended both to third-party exhibitors – for example, streaming platforms and other networks unaffiliated with Warner Bros. – and to Warner Bros.' own affiliated networks and platforms, such as MotorTrend. This meant if MotorTrend, which existed on the exhibition side of Warner Bros., wanted to exhibit the programs, it would have to acquire a license to do so from the catalog business unit, which exists on the distribution side of Warner Bros, which is precisely what occurred.

33. To finance the initial production of the programs, Warner Bros. would perform a license "pre-sale" to its own automotive-focused network called Velocity (later rebranded as the MotorTrend network) for [redacted], taking a [redacted] commission in the process.

34. Effective March 23, 2017, Dangerous Media entered into a valid and enforceable distribution agreement with Discovery Media Ventures Limited (the "2017 Distribution Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**. Through this agreement, Warner Bros. acquired certain rights to seven programs of *Auto/Biography* (the "2017 Programs") from Producers in order to distribute and sell licenses to these programs for an initial term of three years. A later amendment, effective April 15, 2019, increased this to eight episodes. A true and correct copy of the April 15, 2019 amendment is attached hereto as **Exhibit B**. [redacted].

35. Under Section 4(b) of the 2017 Distribution Agreement, as amended, [redacted]. Warner Bros. had no authority under the 2017 Distribution Agreement to enter any new license of the 2017 Programs after March 21, 2022. However, [redacted]

36. The 2017 Distribution Agreement (as amended) granted Warner Bros. [redacted].

37. After the parties entered into the 2017 Distribution Agreement, the 2017 Programs were produced and delivered by Producers, and accepted by Warner Bros. Producers generally performed their duties, and on information and belief, Warner Bros. seemed to perform its contractual distribution obligations.

38. Warner Bros. renamed its Velocity brand as "MotorTrend," and, as confirmed in a February 14, 2019 press release announcing the series, *Auto/Biography* premiered on the MotorTrend App on Saturday, February 16, 2019, and on MotorTrend TV on Saturday, February 23, 2019. Producers accordingly understood the original MotorTrend sublicense to run for a term of up to three years from its February 23, 2019 premiere.

39. The MotorTrend license pre-sale would be the first license sale among many, and as the catalog business unit continued to sell licenses to *Auto/Biography*, Warner Bros. was obligated to report each such license to Producers and pay Producers' contractual share of the resulting revenue, regardless of whether the license was to a third party or to one of Warner Bros.' own properties.

**C. Warner Bros. Agrees to Expand Its Distribution of *Auto/Biography* in 2019**

40. In or around 2019, MotorTrend executives told Producers that the first season of *Auto/Biography* was encouraging co-viewing between the predominantly male viewers of MotorTrend and their female cohabitants, something the network had been trying to accomplish for some time. After conducting its own analysis including focus groups and internal reviews, MotorTrend conveyed its desire to significantly increase its acquisition of *Auto/Biography* programs, ultimately offering to pay roughly twice the original licensing fee — an increase from [redacted] per program to [redacted] per program — and to significantly increase the order size from [redacted] episodes to [redacted].

41. This time, and unlike the terms of 2017 Distribution Agreement, the parties agreed that Producers would [redacted], instead of going through the catalog unit. This meant that that for these [redacted] new programs, the catalog unit would handle all applicable licensing *except* [redacted]. This would avoid a [redacted] commission charged on a sale Warner Bros. was essentially making to itself.

42. Effective October 1, 2019, Angel Valley entered into a Master Agreement with Motor Trend Group, LLC (the "Master Acquisition Agreement"), a true and correct copy of which is attached hereto as **Exhibit C**, together with three related Attachment Agreements (collectively, the "MotorTrend Agreements"), true and correct copies of which are attached hereto as **Exhibit D**, **Exhibit E** , and **Exhibit F**, respectively. Together, these agreements called for MotorTrend [redacted]s (the "2019 Programs") — [redacted].

43. Pursuant to the MotorTrend Agreements:

a. Warner Bros. acquired from Producers [redacted], for a fee of [redacted] (Exhibit D).

b. Warner Bros. acquired from Producers [redacted]1, comprised of thirteen programs, for a fee of [redacted] (Exhibit E).

c. Warner Bros. acquired from Producers certain licenses to [redacted], comprised of one program, for a fee of [redacted] (Exhibit F).

d. Each program's License Period commenced [redacted].

e. [redacted]

[redacted].

44. Effective November 13, 2019, Dangerous Media entered into a new agreement with Discovery Licensing, Inc. (the "2019 Distribution Agreement"), a true and correct copy of which is attached hereto as **Exhibit G**, substantially similar to the 2017 Distribution Agreement, addressing the incorporation of the 2019 Programs into Warner Bros.' catalog business and the related sales and marketing of the 2019 Programs to other distributors and exhibitors.

45. Under Section 4(a) of the 2019 Distribution Agreement, [redacted].

46. At this time, on information and belief, Warner Bros. was already actively performing under the 2017 Distribution Agreement by marketing and selling the 2017 Programs, and the parties generally entered into the 2019 Distribution Agreement so that Warner Bros. could incorporate the 2019 Programs into this ongoing process.

47. Production on the 2019 Programs began promptly and was underway by late 2019. In 2020, production across the entertainment industry was significantly impacted by the COVID-19 pandemic, including the Backroads spinoff. The parties agreed to change the spin-off program so it could be produced with more automation and greater safety for cast and crew. In or around November 2020, *Auto/Biography: Backroads* was changed to *Auto/Biography: Cold Cases*.

48. Final program delivery of all twenty-six 2019 Programs was accepted by Warner Bros. on or around January 22, 2022.

49. After final delivery, MotorTrend paid in full for its initial three-year licenses under the MotorTrend Agreements, and Producers believed Warner Bros. was performing its marketing and sales duties under the 2019 Distribution Agreement just as it had under the 2017 Distribution Agreement. Unbeknownst to Producers, despite Warner Bros.' assurances to the contrary, those sales and marketing efforts were not occurring.

**D. Producers Discover Warner Bros. is Using the *Auto/Biography* Franchise Without a Valid License**

50. Early in 2020, Ched Raymundo, Warner Bros.' Manager of Program Sales & Acquisitions, who played a key role in the 2019 Distribution Agreement, left employment with Warner Bros.

51. As Producers made delivery of the final 2019 program in or around January 2022, the Discovery family of companies was embarking on a merger with WarnerMedia, completed on April 8, 2022, resulting in Warner Bros. Discovery. Among the effects of the merger were large-scale layoffs and operational consolidation that, on information and belief, resulted in significant gaps in operational and institutional knowledge.

52. Whether or not Warner Bros.' misuse arose from internal errors, on information and belief Ms. Raymundo's departure, the merger, and the associated reorganization are likely contributing factors to the institutional failures developing in 2022 that ultimately led to the misuse alleged in this lawsuit.

53. In or around June 2023, Producers observed that the 2017 Programs were again being distributed by Warner Bros. through exhibition on MotorTrend. Producers, however, were not aware that MotorTrend had been issued a new license to air the 2017 Programs because that licensing transaction had not been disclosed in a quarterly report. On June 15, 2023, Producers emailed Warner Bros. via their primary point of contact at MotorTrend, Shaan Akbar, to inquire about the licenses.

54. In his July 13, 2023 response, Mr. Akbar acknowledged that the prior licenses had expired and that the program had re-entered use requiring a license, stating in part "...it seems that you're correct. We are pulling the next re-air and circling back with legal on why it didn't show up in their scheduling system as blocked off."

55. At this point, Producers had not yet received any quarterly statement reporting a new sublicense that would authorize the 2017 Programs' renewed distribution. Producers nonetheless believed, consistent with the parties' course of performance, that the license had simply been renewed

and would be disclosed, along with Producers' share of the associated revenue, in the next quarterly statement.

56. The parties promptly engaged in several discussions about determining, among other things, to what extent programs had been used beyond their authorized terms, and to the extent any programs were found to be unlicensed, Warner Bros. assured Producers they would be removed from exhibition. Producers suggested an audit would be required in order to be certain.

57. Consistent with the parties' course of performance and Warner Bros.' reporting obligations, Producers expected Warner Bros. to identify any valid sublicense authorizing the 2017 Programs' resumed airing and to account for the associated revenue. Warner Bros. did not identify any such valid sublicense or corresponding payment.

58. On information and belief, one of two circumstances existed: (a) a MotorTrend sublicense validly entered during the authorized Finished Program Term remained in effect and permitted the resumed exhibition, in which event the transaction and corresponding revenues were not disclosed to Producers; or (b) no valid sublicense remained in effect, in which event the renewed exhibition of the 2017 Programs was unauthorized. Plaintiffs do not seek adjudication of any claim for breach of the 2017 Distribution Agreement in this action.

59. Each of Warner Bros.' recurring obligations to report, account, and pay under the parties' agreements is separate and independent, and each failure to perform any one of them is a separate and independently actionable breach. With respect to reporting requirements, there is no exception for Warner Bros. being excused from its infringement reporting obligations when Warner Bros. itself is the infringing party.

60. September 30, 2023 came and went, and payment for the license had still not been received, nor had Producers received an audit or any comprehensive report.

61. As 2023 came to an end, Producers became increasingly concerned that Warner Bros. was not resolving the issue. When Producers followed up, Mr. Akbar responded that "we're currently going thru a restructure at [MotorTrend] and will know more in a few weeks or so on next steps on content strategy."

62. On February 21, 2024, Mr. Akbar emailed Producer to communicate to Producers that "[MotorTrend] has stopped buying programming and that I will be leaving the company."

63. Roughly 48 hours later, on or around February 23, 2024, Warner Bros. announced that MotorTrend's streaming service would shut down. On information and belief, internally, the MotorTrend organization was winding down, with employees either being laid off or reassigned elsewhere within Warner Bros.' organization over the coming months.

**E. MotorTrend is Shuttered, Leaving Warner Bros. Misuse Unresolved**

64. With MotorTrend effectively gone, on June 27, 2024, Producers sought further information from Warner Bros. regarding the status of its overuse of the *Auto/Biography* Franchise.

65. On July 31, 2024, Warner Bros. business personnel, including Director of Business Affairs Josh Beck, met with Producers by video call and represented that Producers' June 27, 2024 notice had caught Warner Bros. completely off guard, and that Warner Bros. had no awareness of the overuse, or of any prior legal investigation into it, despite more than a year having passed since Producers' initial notice. Warner Bros. told Producers it would develop a solution to its contractual violations.

66. On September 16, 2024, Warner Bros.' Director of Business Affairs, Josh Beck, contacted Producers and, in recognition of Warner Bros.' overuse of the *Auto/Biography* Franchise, offered to compensate Producers for the overuse, asserting that it arose from an "unfortunate oversight," and explaining Warner Bros.' calculation as follows:

> That leaves us with the only real option, which is to agree on a dollar amount that would resolve the issue. After discussing with our finance folks, they have agreed that we can offer you what we would have paid had the deal had a pre-negotiated option fee. Our standard calculation for all ACQ deals is 50% of one year's license fee, so the breakdown/calculation for Season 1 of A/B would be as follows:
>
> **Original fee**: $50k/ep
>
> **One Year's License Fee**: $50k divided by 3 = $16,666/ep, per year
>
> **Option Calculation**: $16,666 divided by 2 = $8,333/ep.

67. On September 19, 2024, Producers declined Warner Bros.' offer on the basis that it did not reflect the actual scope or duration of Warner Bros.' misuse.

68. On September 20, 2024, Mr. Beck asked Producers to identify a licensing payment amount it would find acceptable. On September 24, 2024, Producers agreed to calculate an appropriate value and informed Mr. Beck it would gather information regarding the scope of Warner Bros.' overuse before responding further.

69. In the weeks following, Producers undertook a broader review of Warner Bros.' use of the *Auto/Biography* Franchise across additional platforms and discovered that Warner Bros.' misuse was substantially more extensive than previously known, running well beyond the three-year license term for every program. Producers had been led to believe Warner Bros. had stopped using the programs in 2023. It had not. Producers discovered the following unauthorized use:

| **Program** | **Licensed Term** | **Actual Use as of Fall 2024** |
|---|---|---|
| *Auto/Biography* Season 1 | 3 years | 6th year of use |
| *Auto/Biography* Season 2 | 3 years | 4th–5th year of use |
| *Auto/Biography: Ford vs. Ferrari* | 3 years | 5th year of use |
| *Auto/Biography: Cold Cases* | 3 years | 4th year of use |

70. On October 15, 2024, Producers provided Warner Bros. a sampling of evidence disputing Mr. Beck's use report, with a copy to Mr. Beck's supervisor, Amber Husbands, Senior Vice President of Business Affairs. On October 22, 2024, after Producers followed up, Ms. Husbands represented: "I'm familiar with this issue [...] My delay in responding is because we are making sure all episodes are pulled from all platforms, and determining how long and on what platforms we were inadvertently making the episodes available after the end of the license so that we can have fruitful conversations."

71. For Programs governed by the 2017 and 2019 Distribution Agreements, Producers also discovered download-to-own copies being sold directly to consumers, even though those agreements [redacted].

72. In December 2024, Warner Bros.' representatives claimed that Producers' programs had again been removed from distribution. Warner Bros. provided, for the first time, a table purporting to reflect its own, unaudited overuse of the programs at that time, as follows:

| Season | Platform with most overage |
|---|---|
| A/B Season 1 | 2.75 years |
| A/B Season 2 | 1.25 years |
| A/B Cold Cases | 6 months, 6 eps |
| A/B Ford v. Ferrari | 2 years |

73. In an email dated December 14, 2024, Warner Bros.' In-House Counsel, Matthew Carroll, told Producers in part: ". . . it is my current understanding that the programs at issue are no longer available on any third-party platforms." On information and belief, that representation was false. Warner Bros.' unauthorized use of the programs in fact continued after December 14, 2024.

74. Despite acknowledging this overuse, Warner Bros. refused to pay Producers the associated license fees, including the option rates set forth in the MotorTrend Agreements and the fee calculation Mr. Beck had himself provided on September 16, 2024.

75. On April 11, 2025, in an email to Producers' former counsel, Warner Bros., through its outside counsel, partially reversed the December 2024 position of its inside counsel, and affirmatively represented that "there were no overages for Season 2", and provided a spreadsheet "reflecting that all uses were in-window." This statement was false, as Season 2 of *Auto/Biography* was still being exhibited to viewers.

76. From December 2024 forward, Warner Bros. continued using one or more Programs without payment despite its claims to have ceased doing so. In August 2025, Producers discovered at least eight Programs available from Warner Bros. for download-to-own licensing through online platforms, including Google Play. To the extent those Programs were governed by the 2017 or 2019 Distribution Agreements, Warner Bros. had never been granted download-to-own licensing rights.

As of the date of this Complaint, one or more Programs are believed to be airing and/or streaming in Italy.

77. In or around 2025, Warner Bros. actively discouraged or declined to participate in communications about *Auto/Biography* directly with Producers, instead directing communications through outside counsel – including ordinary business matters such as sales and use reports and other operational inquiries that would not typically be routed through counsel. On October 27, 2025, Producers emailed a Warner Bros. executive, only to receive a reply hours later from outside counsel requesting that Producers "refrain from contacting WBD executives at this time."

**F. Producers Discover Warner Bros. Also Failed to Perform Under the 2019 Distribution Agreement**

78. Producers' ongoing review of Warner Bros.' misuse uncovered a further and separate contractual violation: Warner Bros.' failure to perform under the 2019 Distribution Agreement. Under that agreement, Warner Bros. was obligated to [redacted]. Producers could not find or otherwise source any catalogs, materials, or evidence that Warner Bros. had performed under that agreement. Searching Warner Bros.' online sales catalog for "*Auto/Biography*" returned a competing program, so that any buyers searching for *Auto/Biography* would not only be unable to find it, but would be shown a competing program to buy. On information and belief, following Ms. Raymundo's departure from Warner Bros., Warner Bros. failed to ensure that her responsibilities under the 2019 Distribution Agreement were transferred to any responsible person or business unit, failed to maintain adequate systems to track and perform its obligations under the Agreement, and allowed the Agreement to be effectively abandoned within its organization while continuing to retain the exclusive rights granted by Producers.

79. To the best of Producers' knowledge, from November 13, 2019 through January 2026, Dangerous Media received no statements reporting Gross Revenues from the 2019 Programs. The

2019 Distribution Agreement does not require DLI to render a statement for an accounting period in which no Gross Revenues were received. Accordingly, the absence of statements was consistent with what Dangerous Media then believed to be unsuccessful sales efforts and did not disclose that DLI had in fact generally failed to perform such sales efforts.

80. DLI's failure to perform occurred within its own sales and distribution operations and was not reasonably observable by Dangerous Media. Dangerous Media had no access to DLI's internal catalog, sales-contact, or licensing records sufficient to determine whether DLI was actually performing. Once Dangerous Media obtained information in early 2025 causing it to suspect nonperformance, it promptly investigated, requested supporting records, and raised the issue directly with WBD and DLI.

81. Each year, as the 2019 Distribution Agreement came up for renewal, Warner Bros. renewed it. On January 22, 2025, after the parties' dispute had arisen, Warner Bros. again renewed the 2019 Distribution Agreement, which Producers believed at the time to signal Warner Bros. continued performance – that they were trying to market and sell the programs. Given that the parties were in their second year of a dispute that involved close review and assessment of the parties' agreements, Producers reasonably concluded that Warner Bros. would not renew the 2019 Distribution Agreement if it did not intend to perform – unless the agreement had slipped through the cracks and was auto-renewing, as Producers would soon come to believe.

82. By March 5, 2025, with no reported sales of any kind, Producers had come to strongly suspect that Warner Bros. had not performed under the 2019 Distribution Agreement. In a Warner Bros. archive, Producers retrieved published sales and marketing materials going as far back as 2021, searching for appropriate catalogs and/or materials that featured the 2019 programs. No 2019 programs were found in any of the published sales and marketing materials viewed by Producers, nor were the 2019 Programs listed in Warner Bros. currently published catalog. When Producers requested Warner Bros. to produce any catalogs indicating performance under the 2019 Distribution Agreement, none could be produced.

83. On March 5, 2025, Producers' Outside Counsel emailed Warner Bros.' In-House Counsel, Matthew Carroll, stating: "The Producers are not aware of any payments received under the 2019 agreement, and it is our current understanding at this point that WBD may not have marketed or sold the related programs at all (or, if they did, the Producers were not compensated for it)."

84. From March 5, 2025 through the time of this filing, in dozens of communications, Producers pressed Warner Bros. for clarity as to its performance. These were ordinary business communications concerning contract performance, not settlement negotiations toward resolving a disputed claim. Warner Bros. nonetheless declined to permit Producers to have these conversations directly with its business executives, instead routing them through counsel for both parties.

85. On information and belief, upon inquiry, Warner Bros.' Outside Counsel, Joel Weiner, correctly recognized that Warner Bros. had not performed under the 2019 Distribution Agreement, stating to Producers' Outside Counsel, Diana Leiden, on a May 19, 2025 telephone call that Warner Bros. had not performed pursuant to the agreement.

86. On June 4, 2025, Producers' Outside Counsel emailed Warner Bros.' Outside Counsel, confirming her understanding of what he had said on a telephone call: "I also understand from our call that WBD intentionally did not distribute *Auto/Biography* under the separate 2019 agreement."

87. On June 12, 2025, Producers' Outside Counsel emailed Warner Bros.' Outside Counsel: "WBD's recent disclosure that it has intentionally not performed its duties under the 2019 exclusive distribution agreement (and apparently does not intend to do so going forward) has left us with no choice but to seek relief from the court . . . ."

88. On June 13, 2025, on a telephone call, Warner Bros.' Outside Counsel again acknowledged Warner Bros. had not performed, and asked Producers to explain why the agreement was still in effect, suggesting Warner Bros. believed it had expired.

89. On June 16, 2025, Producers' Outside Counsel emailed Warner Bros.' Outside Counsel confirming the agreement remained in full effect: "WBD has only now acknowledged it did not perform any distribution under this agreement, despite the existence of known and existing buyers of the franchise to which WBD had previously sold licenses . . . At no time did WBD notify producers

that it was not (and is not) distributing despite inquiries and this dispute — yet WBD also allowed the agreement to renew instead of terminating it . . . this is a real-time problem as the programs are currently licensed exclusively to WBD in many territories, and thus largely 'off the market' pursuant to WBD's non-performance."

90. On June 25, 2025, Producers' Outside Counsel emailed Warner Bros.' Outside Counsel: ". . . without WBD's willingness to comply with the distribution agreement . . . we will have to seek relief from the court soon."

91. On information and belief, Warner Bros., recognizing that the 2019 Distribution Agreement not only existed but was still in effect, thereafter attempted to identify an alternative, more favorable explanation for its lack of sales, resulting in a reversal of its prior admissions of non-performance.

92. On June 27, 2025, Warner Bros.' Outside Counsel, on information and belief acting at all times based on information provided by and under the direction of Warner Bros., reversed Warner Bros.' position in a letter, asserting that he had never told Producers' Outside Counsel that Warner Bros. was not performing, and stating instead: "WBD has made Season 2 and the spinoff of *Auto/Biography* available to many of the same outlets that licensed Season 1 . . . there are multiple reasons why the show has not sold, including that it was not a popular show, that it appealed to niche channels that had their budgets slashed around that time frame, the impact of streaming on linear programming, and corresponding changes within the company . . . WBD has complied, and continues to comply, with its obligation under the 2019 Distribution Agreement."

93. On information and belief, Warner Bros. representation of performance was false. Only two days prior, Producers had obtained directly from Warner Bros. a list of programs in their catalog currently published for sale. The list contained hundreds of programs – and no *Auto/Biography*. Producers were also in possession of Warner Bros. sales and marketing materials as far back as 2021 that did not contain the 2019 Programs. Further, and more obviously, Warner Bros. currently published catalog, plainly visible to Producers and anyone else who cared to look, still did not contain the 2019 Programs.

94. On June 30, 2025, Producers' Outside Counsel replied, challenging this reversal: ". . . we have reason to believe that the statements in the letter regarding WBD's alleged performance of its duties under the 2019 Agreement, based [on] your 'partial investigation,' may not be accurate . . . Please feel free to circulate to us any materials supporting your claims."

95. Upon Producers' Outside Counsel pointing out that the programs were plainly missing from Warner Bros. published catalog, Warner Bros. silently added *Auto/Biography* Season 2 and *Auto/Biography: Cold Cases* to the published catalog on or around July 18, 2025.[2]

96. On July 24, 2025, Warner Bros.' Outside Counsel emailed Producers' Outside Counsel a document purporting to reflect performance under the 2019 Distribution Agreement for Season 2. The document's own dated entries showed no sales efforts after August 23, 2019 — before the 2019 Programs were even produced (and before the contracts to produce them were even signed) – and its internal notes indicated Warner Bros.' own sales agents expected the 2019 Programs to sell in multiple territories, including Italy, Iran, and the MENA region, once produced. In fact, the document still referred to *Auto/Biography: Cold Cases* by its pre-COVID name, *Auto/Biography: Backroads*, supporting what Producers already believed to be true, that sales efforts for *Auto/Biography: Cold Cases* had never even started.

97. On October 3, 2025, Warner Bros. Outside Counsel emailed Producers' Outside Counsel two further documents purporting to reflect performance under the 2019 Distribution Agreement for Season 2. The heavily redacted documents made no direct reference to *Auto/Biography* Season 2 whatsoever, and appeared to instead refer to Season 1.

98. Warner Bros. has been unable or unwilling, from October 3, 2025 through the time of this filing, to produce any support for its claims of performance under the 2019 Distribution Agreement.

---

[2] This action, and other statements and actions alleged herein, are not alleged to establish Warner Bros.' liability or to prove the amount of any disputed claim, but instead for another permissible purpose: to establish fraudulent conduct on the part of Warner Bros. *See, e.g., Ausherman v. Bank of Am. Corp.*, 212 F. Supp. 2d 435 (D. Md. 2002)

99. On November 21, 2025, Warner Bros. inadvertently disclosed that it had misled Producers. Producers received an email from Warner Bros. employee Lara Diego Falagán asking who the distributor was for *Auto/Biography* Season 2, not knowing Warner Bros. itself was the distributor, as reflected in the following email:

Auto/Biography S2 - Italian Rights External Inbox ×

**Diego, Lara** <Lara.Diego@wbd.com> Nov 21, 2025, 5:08 AM
to matt@angel-valley.com, Isabelle

Hi Matthew,

How are you? Hope you're fine. My name is Lara and I work in the Acquisitions team of Warner Bros Discovery. I'm writing to you because we're looking for the distributor of "Auto/Biography S2" in Italy. We acquired in the past S1 from Entertainment, and we didn't realized that there is a S2. We can see in our system that Motor Trend US had acquired from you, Do you distribute it for Italy or you know who does? We could be interested for Motor Trend Italy (Free to Air Channel).

Thank you so much,
Lara

**Lara Diego Falagán**
**Content Sourcing and Acquisitions Executive, EMEA, Spain, Italy, Turkey & Middle East**
Warner Bros. Discovery | C/ Martinez Villergas 52, edificio B, 28027 Madrid Spain
**M: +34 676 042 696 | W: +34 917 947 633 | e-mail:** lara.diego@wbd.com

WARNER BROS. DISCOVERY

100. When Producers responded on November 24, 2025 that Warner Bros. itself was the distributor and referring her to a Warner Bros. colleague, Elliot Wagner, to arrange a sale, Ms. Falagán replied: "Thank you so much Matt, *I didn't see it in the catalogue, so I didn't ask before because of that*. Is great to know." (Emphasis added.)

101. On information and belief, following Producers referring Ms. Falagán to her colleague, one or more licenses or other exploitation arrangements concerning the 2019 Programs were entered for the Italy territory. As of filing, one or more Programs have been observed airing and/or streaming in Italy, yet Dangerous Media has received no statement reporting any corresponding Gross Revenues and no payment attributable to that exploitation.

102. In failing to perform, Warner Bros. effectively removed Producers' franchise from the market for several years, damaging brand value, public awareness, buyer interest, and future earning potential. Producers stopped further production of new programs within the *Auto/Biography* Franchise as a direct result.

103. At the time Producers ceased further production, the *Auto/Biography* Franchise had experienced license fee growth of approximately 98% and order size growth of approximately 300% between the first and second seasons.

104. Warner Bros.' claim to have performed under the 2019 Distribution Agreement is particularly beyond belief, as Warner Bros. simultaneously argues it lost control of distribution for years with respect to the MotorTrend Agreements, while claiming complete control of distribution with respect to the 2019 Distribution Agreement.

105. On August 12, 2026, Producers provided Warner Bros. an Audit Notice [redacted], seeking the independent, third-party audit of Warner Bros.' license compliance and distribution operations that years of unfulfilled promises and contradictory statements had made necessary. On August 17, 2026, Warner Bros. disputed Producers' assertion of its audit rights and would not permit the audit (including by attempting to negotiate audit procedures before agreeing to audit rights) – the latest in a continuing pattern of resisting the very transparency that would reveal the true scope of its misconduct.

106. As of the date of filing, DLI remains in breach of its obligations under the 2019 Distribution Agreement, and WBD continues to face claims arising from the unauthorized exploitation alleged herein.

**FIRST CAUSE OF ACTION**

**Breach of Contract**

**The 2019 Distribution Agreement**

107. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 106 of this Complaint as though fully set forth herein.

108. The 2019 Distribution Agreement constitutes a valid, written contract between Dangerous Media and DLI.

109. Dangerous Media has either fully performed its obligations under the 2019 Distribution Agreement or is excused from performance.

110. All conditions precedent to DLI's performance under the 2019 Distribution Agreement were satisfied or excused.

111. DLI received the [redacted]. Dangerous Media received no advance or other guaranteed compensation for granting those exclusive rights; [redacted]. By accepting an exclusive sales agency that prevented Dangerous Media from independently exploiting those rights while making Dangerous Media's compensation dependent upon DLI's performance, DLI assumed an implied obligation to use reasonable, good-faith efforts to market and license the 2019 Programs.

112. DLI, directly and through persons acting on its behalf in administering the 2019 Distribution Agreement, breached the Agreement by, among other things:

a. failing to use reasonable, good-faith efforts to market and license the 2019 Programs;

b. failing for years to include the 2019 Programs in its sales catalog and other materials through which DLI marketed programs to prospective licensees;

c. failing to report, account for, and pay Dangerous Media its contractual share of Gross Revenues actually received from exploitation of the 2019 Programs, including revenues associated with any licenses issued in Italy or elsewhere; and

d. to the extent established through discovery, selling or authorizing exploitation of the 2019 Programs through download-to-own or other rights expressly reserved from DLI under the Agreement.

113. As a direct and proximate result of DLI's breaches, Dangerous Media has suffered damages, including lost distribution revenues and other consequential damages reasonably resulting from DLI's failure to perform, in an amount to be proven at trial.

114. DLI's breach also substantially impaired the commercial value and future exploitation of the *Auto/Biography* Franchise. To the extent Dangerous Media itself suffered lost revenues from the cessation of further production, those losses were a foreseeable consequence of DLI's failure to market the Franchise. The Franchise had an established operating history and a documented pattern of increasing license fees and episode orders, providing a factual basis from which recoverable lost revenues may be determined, subject to proof at trial.

115. Dangerous Media further seeks all contractual statements, accounting information, and other payment information to which it is entitled under the 2019 Distribution Agreement, together with damages for all amounts shown to be due.

**SECOND CAUSE OF ACTION**

**Breach of Contract**

**The Master Acquisition Agreement and Attachment Agreements**

**(Against WBD and Does 1 through 10)**

116. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 115 of this Complaint as though fully set forth herein.

117. The Master Acquisition Agreement constitutes a valid, written contract between Angel Valley and MTG.

118. Angel Valley has either fully performed its obligations under the Master Acquisition Agreement and its three Attachment Agreements, or is excused from performance.

119. As alleged above, Plaintiffs allege on information and belief and in the alternative that WBD and/or one or more presently unidentified Defendants received, assumed, or succeeded to MTG's relevant contractual rights and obligations in connection with WBD's reorganization of the MotorTrend television business. Plaintiffs will amend this allegation when the allocation and assignment of those obligations is established through discovery.

120. All conditions precedent to MTG's performance, and to the performance of any assignee or successor that assumed MTG's contractual obligations, were satisfied or excused.

121. Under each Attachment to the Master Acquisition Agreement, [redacted].

122. On information and belief, the following are the dates of the initial North American exhibition of each of the twenty-six 2019 Programs governed by the MotorTrend Agreements. The corresponding License Period for each Program continued for three years from its initial exhibition in that Territory. Because Defendants possess the records establishing initial exhibition in other Territories, those dates will be established through discovery:

| | |
|---|---|
| Auto/Biography– Ford v Ferrari | November 24, 2019 |
| Auto/Biography Season 2, Episode 1 | October 6, 2020 |
| Auto/Biography Season 2, Episode 2 | October 13, 2020 |
| Auto/Biography Season 2, Episode 3 | October 20, 2020 |
| Auto/Biography Season 2, Episode 4 | October 27, 2020 |
| Auto/Biography Season 2, Episode 5 | November 3, 2020 |
| Auto/Biography Season 2, Episode 6 | November 10, 2020 |
| Auto/Biography Season 2, Episode 7 | October 15, 2021 |
| Auto/Biography Season 2, Episode 8 | October 22, 2021 |
| Auto/Biography Season 2, Episode 9 | October 29, 2021 |
| Auto/Biography Season 2, Episode 10 | November 5, 2021 |
| Auto/Biography Season 2, Episode 11 | November 12, 2021 |
| Auto/Biography Season 2, Episode 12 | November 20, 2021 |

| | |
|---|---|
| Auto/Biography: Cold Cases Season 1, Episode 1 | December 29, 2020 |
| Auto/Biography: Cold Cases Season 1, Episode 2 | April 8, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 3 | April 15, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 4 | April 22, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 5 | April 29, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 6 | May 6, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 7 | December 3, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 8 | December 10, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 9 | December 31, 2021 |
| Auto/Biography: Cold Cases Season 1, Episode 10 | January 7, 2022 |
| Auto/Biography: Cold Cases Season 1, Episode 11 | January 14, 2022 |
| Auto/Biography: Cold Cases Season 1, Episode 12 | January 21, 2022 |
| Auto/Biography: Cold Cases Season 1, Episode 13 | January 28, 2022 |

123. On information and belief, MTG and any successor or assignee of its relevant rights did not timely exercise the option to extend the License Period for one or more of the 2019 Programs and has not paid the associated option fee for any such Program. For each Program as to which no option was timely exercised, the contractual License Period expired at the conclusion of the applicable three-year term.

124. In the alternative, to the extent MTG or a successor or assignee timely exercised the option for any 2019 Program, the failure to pay the resulting option fee within the time required by the applicable Attachment constitutes a breach of the MotorTrend Agreements.

125. The Master Acquisition Agreement separately [redacted]. On information and belief, MTG and/or the entity succeeding to its relevant rights and obligations failed to comply with that obligation and instead retained copies of the 2019 Programs that WBD and/or other WBD-controlled entities continued to exhibit, distribute, and exploit after the applicable License Periods had expired.

126. As a direct and proximate result of the contractual breaches alleged above, Angel Valley suffered damages in an amount to be proven at trial. To the extent any applicable option was timely exercised, those damages include the unpaid contractual option fee. Angel Valley further seeks damages resulting from the failure to comply with the Agreement's express post-expiration obligations. Damages arising from unauthorized post-expiration exploitation of *Auto/Biography: Ford vs. Ferrari* are additionally sought under the Copyright Act as alleged below.

**THIRD CAUSE OF ACTION**

**Copyright Infringement**

**(Against WBD and Does 1 through 10)**

127. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 126 of this Complaint as though fully set forth herein.

128. The information included in the attached Exhibits is incorporated fully herein.

129. Plaintiff owns the copyright in *Auto/Biography: Ford vs. Ferrari*, registered with the United States Copyright Office as Registration No. PA 2-548-846, effective September 5, 2025. A true and correct copy of the Registration is attached hereto as **Exhibit H**.

130. Plaintiffs have also created and own sole and exclusive copyrights in and to the remaining 2017 Programs and 2019 Programs. Applications for registration of these works are currently pending before the United States Copyright Office. Plaintiffs bring this Third Cause of Action at this time solely as to *Auto/Biography: Ford vs. Ferrari*, and reserve the right to amend this Complaint to add claims for infringement of the remaining works upon issuance of their respective registrations, consistent with 17 U.S.C. § 411(a) and *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296 (2019).

131. Beginning after expiration of the applicable license, WBD directly infringed the copyright in *Auto/Biography: Ford vs. Ferrari* by reproducing, distributing, publicly performing, and/or authorizing the reproduction, distribution, and public performance of the work without authorization, in violation of 17 U.S.C. § 106.

132. WBD's infringement and unauthorized use of the copyrighted work was willful, intentional, and/or reckless.

133. Plaintiffs seek the copyright owner's actual damages and WBD's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), together with all other relief available under the Copyright Act.

134. On information and belief, Motor Trend Group, LLC and any successor or assignee of its rights did not timely exercise the option to extend the License Period for *Auto/Biography: Ford vs. Ferrari*. The License Period therefore expired at the conclusion of November 24, 2022. From and after November 25, 2022, WBD and any other entity exploiting the Program without a separate valid license held no authorization or other contractual right to copy, distribute, exhibit, display, sell, or otherwise exploit *Auto/Biography: Ford vs. Ferrari*, and each such unauthorized use constituted an act of copyright infringement. To the extent Defendants contend that the option was timely exercised, Plaintiffs allege in the alternative that the failure to pay the applicable option fee constitutes the contractual breach alleged in the Second Cause of Action.

135. WBD's own investigation confirmed that *Auto/Biography: Ford vs. Ferrari* remained in use well beyond its original License Period. In December 2024, WBD provided Plaintiffs a table reflecting approximately two years of overuse of the Ford vs. Ferrari special. WBD's unauthorized exploitation continued thereafter and, on information and belief, continued after the effective date of registration.

**<u>FOURTH CAUSE OF ACTION</u>**

**Fraudulent Misrepresentation**

**MotorTrend Agreements**

**(Against WBD and Does 1 through 10)**

136. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 135 of this Complaint as though fully set forth herein.

137. This claim is based on WBD's knowing misrepresentation of existing or past facts concerning its own knowledge, use, and compliance, made to induce Plaintiffs' continued

forbearance and reliance. The claim does not depend upon treating a promise of future performance as a representation of present fact.

138. WBD made multiple materially false representations concerning existing or past facts regarding its knowledge and use of the Programs, including:

a. On July 31, 2024, WBD business personnel represented to Plaintiffs that Plaintiffs' June 27, 2024 inquiry had caught WBD completely off guard and that WBD had no awareness of the overuse or any prior investigation of it, despite Plaintiffs' express notice to WBD personnel in June 2023 and WBD's July 13, 2023 acknowledgment that Programs had re-entered use after expiration of the applicable license;

b. On December 14, 2024, WBD's in-house counsel Matthew Carroll represented that it was his current understanding that the Programs at issue were no longer available on any third-party platforms; and

c. On April 11, 2025, WBD, through its outside counsel, represented that there were no overages for Season 2 and provided a spreadsheet purportedly reflecting that all uses were within the licensed period.

139. Each representation was materially false when made. As alleged above, WBD had previously been informed of and investigated the overuse; the Programs remained available after December 14, 2024; and Season 2 remained in exhibition notwithstanding WBD's April 11, 2025 representation that all uses were within the licensed period.

140. WBD knew the representations were false when made or made them with reckless indifference to their truth. WBD controlled the scheduling, licensing, distribution, and related records necessary to determine its prior knowledge and the then-current use of the Programs, yet repeatedly communicated inaccurate factual information after having undertaken to investigate the overuse.

141. Warner Bros. intended that Plaintiffs rely on these false representations. Warner Bros. was financially and otherwise motivated to conceal as much of its misuse as possible, intending for Plaintiffs to rely upon representations that under-reported that misuse, because the less misuse Plaintiffs were aware of, the less compensation Plaintiffs would be likely to pursue.

142. Plaintiffs reasonably relied on WBD's representations by refraining from immediately seeking judicial relief to halt the unauthorized exploitation and by allowing WBD additional time to investigate, remove the Programs, and accurately report the scope of the overuse.

143. That reliance caused harm distinct from the amounts already due under the contracts. During the resulting delay, WBD's unauthorized exploitation continued, increasing the duration and scope of the unauthorized use and interfering with Plaintiffs' ability to exploit the affected rights elsewhere. Plaintiffs seek recovery of the damages proximately caused by that reliance in an amount to be proven at trial.

144. Plaintiffs' reliance on Warner Bros.' false representations was a substantial factor in Plaintiffs' damages.

## FIFTH CAUSE OF ACTION

### Fraudulent Misrepresentation

### 2019 Distribution Agreement

145. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 144 of this Complaint as though fully set forth herein.

146. This claim is based on Warner Bros.' knowing misrepresentation of the existing facts of its own conduct and compliance – not on any promise or prediction of Warner Bros.' future performance – made to induce Plaintiffs' continued forbearance and reliance. Because each representation was either true or false as a statement of present fact at the moment it was made, this claim is independent of, and does not depend upon, whether Warner Bros.' underlying conduct also constitutes a breach of the parties' agreements.

147. On information and belief, from November 13, 2019 through January 22, 2026, Plaintiffs received no sales reports for the 2019 Programs from Warner Bros., leading Plaintiffs to believe that Warner Bros.' sales efforts had been unsuccessful.

148. Each year, when the 2019 Distribution Agreement came up for renewal, Warner Bros. renewed the agreement. On January 22, 2025, during this dispute, Warner Bros. again renewed the 2019 Distribution Agreement.

149. On March 5, 2025, Producers' Outside Counsel emailed WBD's In-House Counsel, stating in part: "The Producers are not aware of any payments received under the 2019 agreement, and it is our current understanding at this point that WBD may not have marketed or sold the related programs at all (or, if they did, the Producers were not compensated for it)."

150. On July 18, 2025, on a telephone call between WBD's Outside Counsel and Producers' Outside Counsel, Warner Bros. stated that it had in fact performed and was performing pursuant to the agreement, attributing its inability to generate any sales to market conditions, buyer budgets, and similar factors. Plaintiffs requested backup for these claims, and Warner Bros. was unable to provide any.

151. On November 21, 2025, Warner Bros. inadvertently disclosed that it had misled Plaintiffs with respect to its performance under the 2019 Distribution Agreement, through Ms. Falagán's email described above.

152. These statements were representations of Warner Bros.' own existing knowledge of its performance under the 2019 Distribution Agreement at the time each statement was made – not predictions or promises about future conduct. WBD's Outside Counsel's own July 24, 2025 production, reflecting no sales efforts after August 23, 2019, establishes that Warner Bros. knew, at the time it represented ongoing performance and compliance in June and July 2025, that no such performance had in fact occurred.

153. Warner Bros. intended that Plaintiffs rely on these false representations, and was financially and otherwise motivated to conceal its non-performance.

154. Plaintiffs reasonably relied on Warner Bros.' false representations until they learned of their falsehood through their own investigations and Warner Bros.' inadvertent disclosure, and brought this lawsuit.

155. Plaintiffs suffered damages, in an amount to be determined at trial, specifically caused by their reliance on Warner Bros.' false representations — distinct from and in addition to the damages caused by Warner Bros.' underlying nonperformance under the 2019 Distribution Agreement. Had Warner Bros. truthfully disclosed its nonperformance rather than repeatedly

misrepresenting that it was performing, Plaintiffs would have pursued contractual remedies and/or ceased further investment in the Auto/Biography Franchise at that earlier time. Instead, in reliance on Warner Bros.' false assurances that the absence of sales reflected only unsuccessful market efforts rather than a complete failure to perform, Plaintiffs continued to believe the market was not acquiring the 2019 Programs, and as a direct result discontinued further production of the Auto/Biography Franchise — a decision Plaintiffs would not have made, or would have made differently, had they known the truth of Warner Bros.' nonperformance when each representation was made. At the time of discontinuation, the Auto/Biography Franchise had experienced license fee growth of approximately 98% and order size increases of approximately 300% between the first and second seasons. This loss is amplified with respect to the spin-off series, Auto/Biography: Cold Cases, categorized as a "true crime" series, a genre that has well-established broad global market appeal and was expected to outsell the main Auto/Biography series. Warner Bros. false representations included elaborate explanations of why the programs had not sold, when in reality, the reason the programs did not sell is because Warner Bros. did not try to sell them, while representing that they did.

Plaintiffs' reliance on Warner Bros.' false representations was a substantial factor in Plaintiffs' damages.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against WBD and Does 1 through 10)

156. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 155 of this Complaint as though fully set forth herein.

157. Plaintiffs plead this claim in the alternative to the Fourth Cause of Action, to the extent the trier of fact determines that WBD's misrepresentations concerning its knowledge and use of the Programs were made negligently rather than knowingly or recklessly.

158. After Plaintiffs notified WBD of unauthorized use of the Programs, WBD undertook to investigate the scope of that use and repeatedly provided Plaintiffs specific factual information concerning which Programs had been used, the duration and platforms of that use, and whether the

Programs had been removed. WBD knew that Plaintiffs lacked access to WBD's internal scheduling, distribution, and licensing systems and would necessarily rely on WBD's investigation and reporting in determining whether further action was required.

159. Through that direct course of communications and WBD's undertaking to investigate and provide information specifically for Plaintiffs' guidance, WBD assumed a duty to exercise reasonable care in communicating accurate information concerning its own use of the Programs.

160. WBD breached that duty by negligently communicating the materially inaccurate information identified in the Fourth Cause of Action, including its representations concerning prior knowledge of the overuse, removal of the Programs, and whether particular uses fell within the applicable license periods.

161. WBD had no reasonable grounds for believing these statements were true when made. WBD possessed or controlled the information necessary to verify its own knowledge and use of the Programs and could have confirmed or corrected those statements before communicating them to Producers.

162. WBD knew, or should have known, that Producers would rely on those representations in deciding whether immediate legal action or further investigation was required to protect their rights and halt unauthorized exploitation.

163. Producers reasonably relied on these representations to their detriment until they learned of their falsity through their own investigation and WBD's subsequent disclosures.

164. As a direct and proximate result of WBD's negligent misrepresentations, Producers were delayed in pursuing legal remedies while unauthorized exploitation continued, causing damages in an amount to be proven at trial.

165. Producers' reliance on WBD's negligent misrepresentations was a substantial factor in Producers' damages.

## SEVENTH CAUSE OF ACTION

### Accounting

166. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 165 of this Complaint as though fully set forth herein.

167. A contractual relationship exists between Plaintiffs and Warner Bros. which requires an accounting, [redacted].

168. This accounting is required, among other things, to determine both the revenue share validly owed to Plaintiffs during the periods each license remained in effect, and the profits Warner Bros. derived from its use of the Programs after the respective licenses, as extended, had terminated.

169. Warner Bros. has received payments, revenue, benefits, and/or earnings, a portion of which belong to Plaintiffs, and which Warner Bros. has not properly accounted for.

170. An accounting is required to ascertain the amount owed by Warner Bros. and DLI to Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:

1. To enter an order in favor of Plaintiffs for each Cause of Action asserted herein;

2. For all damages available in law and according to proof at trial;

3. For exemplary and punitive damages;

4. For pre- and post-judgment interest to the extent permitted by law;

5. For reasonable attorneys' fees and court costs to the extent permitted by law;

6. For injunctive relief pursuant to 17 U.S.C. § 502 prohibiting WBD and those acting in concert with it from further unauthorized reproduction, distribution, public performance, or other infringement of *Auto/Biography: Ford vs. Ferrari*, and for such additional injunctive relief as may become available with respect to other registered works properly added to this action;

7. For all statements, accounting information, and payment information contractually due to Dangerous Media under the 2019 Distribution Agreement, and for WBD's profits attributable to infringement to the extent recoverable under 17 U.S.C. § 504(b);

8. For all such other relief that the Court determines to be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 17, 2026

Respectfully submitted,

**TENLEY LAW, P.C.**

/s/ *Scott D. Tenley*

Scott D. Tenley (Pro Hac Vice Pending)
2601 Main Street, Suite 850
Irvine, California 92614
Telephone: (949) 749-2300
Facsimile: (949) 520-6727
Email: scott@tenleylaw.com
(signed by Michael W. Gaches with permission of Scott D. Tenley)

**TUCKER ELLIS LLP**

/s/ *Michael W. Gaches*

Michael W. Gaches (31780)
2000 Duke Street, Suite 318
Alexandria, Virgina 22314
Telephone: (202) 505-6284
Facsimile: (216) 592-5009
Email: michael.gaches@tuckerellis.com

Attorneys for Plaintiffs
Dangerous Media, LLC & Angel Valley Productions, LLC

# Exhibit A

**[FILED UNDER SEAL]**

# Exhibit B

**[FILED UNDER SEAL]**

# Exhibit C

**[FILED UNDER SEAL]**

# Exhibit D

**[FILED UNDER SEAL]**

# Exhibit E

**[FILED UNDER SEAL]**

# Exhibit F

**[FILED UNDER SEAL]**

# Exhibit G

**[FILED UNDER SEAL]**

# Exhibit H

**Registration #:** PA0002548846
**Service Request #:** 1-14993351411

## Mail Certificate

Dangerous Media LLC
59 E Orange Grove Ave
Burbank, CA 91502 United States

**Priority:** Special Handling **Application Date:** September 05, 2025

## Correspondent

**Organization Name:** Dangerous Media LLC
**Name:** Matthew Lewis
**Email:** legal@angel-valley.com
**Telephone:** (626)869-6150
**Address:** 3579 E Foothill Blvd #117
Pasadena, CA 91107 United States

**Registration Number**
# PA 2-548-846
**Effective Date of Registration:**
September 05, 2025
**Registration Decision Date:**
September 05, 2025

## Title

**Title of Work:** Auto/Biography: The Story Of Ford vs Ferrari

## Completion/Publication

**Year of Completion:** 2019
**Date of 1st Publication:** November 24, 2019
**Nation of 1st Publication:** United States

## Author

- **Author:** Dangerous Media LLC
  **Author Created:** entire motion picture
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Dangerous Media LLC
59 E Orange Grove Ave, Burbank, CA, 91502, United States

## Limitation of copyright claim

**Material excluded from this claim:** preexisting footage, preexisting photograph(s), preexisting music

**New material included in claim:** all other cinematographic material, production as a motion picture

## Certification

**Name:** Matthew Lewis
**Date:** September 05, 2025